UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Hon. John Michael Vazquez |
| v. | : | |
| | : | Crim. No. 22-165 (JMV) |
| AMERICAN EEL DEPOT CORP., | : | |
| ET AL., | : | Hearing: Sep. 19, 2023, 10:30am |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT AMERICAN EEL DEPOT'S
AND DEFENDANT HUANG'S MOTION TO DISMISS**

TODD S. KIM
Assistant Attorney General

ETHAN EDDY
MATTHEW EVANS
Trial Attorneys
U.S. Department of Justice
Environmental Crimes Section
150 M St. NE
Washington, DC 20002
(202) 305-0202
ethan.eddy@usdoj.gov

## TABLE OF CONTENTS

Table of Authorities ................................................................. iii

I.     Background .................................................................. 2

       A.    Nations Acting Together to Prevent Extinction ............................. 2

       B.    The Plight of the European Eel ...................................... 3

       C.    Defendants' Illegal Trafficking In Eels ............................ 5

II.    Legal Background ........................................................ 8

       A.    U.S. Laws Implementing the CITES Treaty.................................. 8

       B.    Standard for Motion to Dismiss ...................................... 9

III.   Procedural Posture ......................................................... 11

IV.    Defendants Cannot Meet Their Heavy Burden to Support Their
       Assertion of the 'Outrageous Government Conduct' Defense.. .............. 11

       A.    The Investigation Was Routine and Not At All Out of
             the Ordinary or Shocking to the Conscience. ............................ 12

             1.    2014 Search Warrant ...................................... 12

             2.    2015 Border Inspection ................................. 12

             3.    2016 Border Inspection ................................. 14

             4.    2017 Container Seizures and Search Warrant ................ 16

       B.    The Government Is Not Obligated to Inform Suspected
             Smugglers When It Investigates Their Smuggling......................... 20

       C.    The Government Had No Obligation to Inspect or Seize Every
             Incoming Container.................................................. 22

       D.    The Government Did Not Mislead Defendants Into Thinking
             That It Was Okay to Continue Smuggling European Eel.............. 27

i

E.      It Was Not "Unfair" or "Outrageous" to Inspect Containers
        #4 - #6 and Charge Defendants for the Contraband Within..........29

V.    Defendants' Motion Also Raises Issues of Fact Going Directly
      to the Charges. ........................................................................33

      A.      The Court Can and Should Deny the Motion Without Wading Into
              Defendants' Intent Arguments. ..................................................33

      B.      In the Alternative, If the Court Cannot Resolve the Asserted
              Defense Without Addressing Defendants' Intent Issues, It
              Should Deny the Motion on That Basis........................................34

VI.   The Court Should Decline Defendants' Request for an Evidentiary
      Hearing ......................................................................................35

VII.  Conclusion .................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
  515 U.S. 687 (1995) ...................................................................... 2

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) ......................... 2

*United States v. Austin*, 2:17-cr-19 (E.D. Va. Feb. 14, 2017) ............. 6

*United States v. Chin*, 934 F.2d 393 (2d Cir. 1991) ................................. *passim*

*United States v. Covington*, 395 U.S. 57 (1969) ........................................ 10, 34

*United States v. DeLaurentis*, 230 F.3d 659 (3d Cir. 2000) ............................... 9

*United States v. Dunham*, 2021 WL 3045372 (E.D. Pa. July 20, 2021) ........... 35

*United States v. Gallagher*, 602 F.2d 1139 (3d Cir. 1979) ......................... 10, 34

*United States v. Huet*, 665 F.3d 588 (3d Cir. 2012) ........................................... 9

*United States v. Lakhani*, 480 F.3d 171 (3d Cir. 2007) ............................. *passim*

*United States v. Nolan-Cooper*, 155 F.3d 221 (3d Cir. 1998) ..................... 10, 11

*United States v. Pitt*, 193 F.3d 751 (3d Cir. 1999) ................................... *passim*

*United States v. Russell*, 411 U.S. 423 (1973) ................................................. 10

*United States v. Santana*, 6 F.3d 1 (1st Cir. 1993) ........................................... 10

*United States v. Shortt Accountancy Corp.*, 785 F.2d 1448 (9th Cir. 1986) ...... 10

*United States v. Stenberg*, 803 F.2d 422 (9th Cir. 1986) ................................ 27

*United States v. Twigg*, 588 F.3d 373 (3d Cir. 1978) ................................ 25, 26

*United States v. Vitello*, 490 F.3d 314 (3d Cir. 2007) ........................................ 9

*United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996). ................................. 11, 35

**Statutes**

16 U.S.C. § 1538(c) ................................................................ 9, 24

16 U.S.C. § 3372 .................................................................... 11, 24

16 U.S.C. § 3373(d)(3)(A)(i) ........................................................ 11

18 U.S.C. § 545 ......................................................................... 24

19 U.S.C. § 1499(a)(1) .................................................. 18, 19, 29, 30

**Treaty**

Convention on International Trade in Endangered Species of Wild
   Flora and Fauna, Mar. 3, 1973, 27 U.S.T. 1087, TIAS 8249. ............ 2, 3, 5, 8

**Regulations**

19 C.F.R. § 4.38 ..................................................................... 19, 30

19 C.F.R. § 18.25 ........................................................................ 31

19 C.F.R. § 141.113 ..................................................................... 24

19 C.F.R. § 162.3 ................................................................... 29, 31

50 C.F.R. § 14.61 .................................................................... 9, 13

50 C.F.R. § 23.13 ........................................................................ 24

50 C.F.R. § 23.20 ............................................................... 9, 13, 24

50 C.F.R. § 23.23 .................................................................... 9, 13

Defendants American Eel Depot Corp. ("AED") and Yi Rui Huang (hereinafter "Defendants") have moved to dismiss the Indictment in this case (ECF No. 89) ("Defs.' Mot.").[1] The Defendants' motion's principal argument is that the government should have kept them or their counsel abreast of the details and progress of the government's investigation into Defendants' illegal conduct while it was still ongoing. As the government will show, unsurprisingly, this novel premise that the government must keep the targets of its investigation apprised of its on-going efforts to investigate their criminal conduct is unsupported by any legal authority. There was no "outrageous government conduct" because the government did not initiate or otherwise further Defendants' knowing and intentional conspiracy to smuggle illegal protected wildlife – *tons* of it – into the United States. Because Defendants AED and Huang cannot meet their heavy burden in substantiating their defense, the Court should deny their motion on its merits. Nor have they presented a colorable claim that would justify an evidentiary hearing.

Defendants' motion also suffers from another defect. Some of the factual arguments they raise in service of their unfounded theory go directly to the substantive merits of the charges in the Indictment, and thus to what the jury would be called upon to decide at trial. The government believes that the Court can deny the motion on its merits without engaging those factual arguments –

---

[1] Defendants Fen Liu, Chao Jin Shi, and Guo Tuan Zhao have appeared but did not file a motion or a joinder. Defendants Yundong Wei, Hong Lee, Liang Chen, and Xiujuan Huang Zhouyi have not yet appeared. Wei, Chen, and Zhouyi are Chinese nationals who reside in China. Lee is a citizen of Hong Kong, where he resides.

which the government will identify for the Court so they can be segregated. However, if the Court cannot resolve the motion without delving into those issues, it should deny the motion on that basis alone.

## I.     Background

### A.     Nations Acting Together to Prevent Extinction

For more than 150 years, the United States has been a world leader in protecting wild animals from extinction, through the passage and enforcement of federal laws and multi-lateral treaties to accomplish this vital aim. The modern centerpiece of those laws is the federal Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, which is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 698 (1995) (citation omitted). Its passage marks a commitment by Congress "to halt and reverse the trend towards species extinction, whatever the cost." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

Congress enacted the ESA in part to implement the Convention on International Trade in Endangered Species of Wild Flora and Fauna ("CITES"), a multi-lateral treaty that was created in 1973 at a meeting of eighty nations, hosted by the United States in Washington, DC. 27 U.S.T. 1087; TIAS 8249, Mar. 3, 1973.[2] Today, 184 countries are parties to this treaty. In a nutshell, the goal of CITES is to prevent extinction by prohibiting or regulating international

---

[2] The current treaty text is accessible at https://cites.org/eng/disc/text.php.

trade in certain listed wildlife species, agreed to by the parties, whose continued existence is put in peril by such trade.

If a nation observes a population decline in one of its native species, it can pass its own domestic legislation to protect the species – but if that nation is a party to CITES, it can also do more. It can obtain the help of the entire CITES community by proposing to add that species to the protected lists (known as Appendices). CITES, Art. XV(1)(a). Upon a vote by the parties, that species receives CITES protection, meaning that international trade in the species can only occur, if at all, by way of tightly-controlled export permits from the country of origin. *Id.*, Art. III-IV. All parties, by virtue of their participation in CITES, help the sponsor nation by preventing unpermitted trade in that species from coming into their countries. *Id.*, Art. VIII(1).

**B.      The Plight of the European Eel**

This case involves two eel species – European eel (*Anguilla anguilla*), and American eel (*Anguilla rostrata*). European eels are protected by CITES. American eels are not, although the U.S. states in which they occur ban or tightly regulate their catch, transport, and trade.

The European eel is a snake-like fish that is believed to spawn in the Sargasso Sea. While still in their larval state, European eels make an incredible 4,000-mile migratory journey most of the way across the Atlantic Ocean. Baby European eels, called *elvers*, then proceed into estuary and river systems across much of Europe, where they mature into adults. The natural life cycle of a European eel is to spend five to fifty years in the river it migrated to, and then

3

return to the ocean, where it will migrate 4,000 miles back to where it was born, mate with other eels who have likewise returned, and die.[3]

Adult European eels have been fished for human subsistence for centuries if not millennia. But international trade in the species, fueled by demand in other parts of the world, has hastened the decline of the species. Fishermen would net large quantities of live migrating European eel elvers, package them by the tens of thousands in oxygenated bags, and ship them live in parcels to facilities in Asia. From there, the elvers would be reared at aquaculture facilities, slaughtered, and processed for the sushi trade.

Largely because of this trade, the European eel population has declined by at least 90 percent, and perhaps as much as 98 percent, since the 1960s. The International Union for the Conservation of Nature ("IUCN"), a network of 1,400 governmental and non-governmental organizations that gathers and analyzes data related to wildlife conservation, classifies the European eel as "Critically Endangered," the most dire of its classifications other than "Extinct in the Wild," and "Extinct." By comparison, Giant Pandas and Mountain Gorillas are the less critical "Vulnerable" and "Endangered."

In response to this crisis, the European Union ("EU") petitioned the CITES parties in 2007 to add the European eel to the CITES Appendix II list of protected species. The CITES parties voted to accept the petition and the species was added to Appendix II. This listing became enforceable on March 13, 2009. The CITES Appendix II listing means that, as relevant here, an importer

---

[3] Due to their complex biology, European eels cannot be bred in captivity.

4

of a listed species must present a valid export permit issued by the country of origin. *See* CITES, Art. III. The EU also enacted its own protections on December 3, 2010, including an outright ban on the export and import of European eels and elvers, live or dead. This ban is still in effect today.

Evidence at trial will show that during the period of the conspiracy described in the Indictment, the black market value of European eel elvers was about $1,300 - $2,300 per kilogram. Due to the confluence of low legal supply and high worldwide demand, many experts believe illicit eel trade to be the world's largest wildlife trafficking problem, as measured in either black-market dollars or by the number of animals unlawfully trafficked. *See*, *e.g.*, Agence France-Press, *Eel trafficking in the EU, the world's 'biggest wildlife crime,'* EDNH NEWS (Nov. 21, 2018), *available at*: https://ednh.news/eel-trafficking-in-the-eu-the-worlds-biggest-wildlife-crime/.

### C.  Defendants' Illegal Trafficking in Eels

Following the EU ban and CITES listing for the European eel, demand for American eel also surged. That species is declining as well. Between 2011 and 2017, the U.S. Fish and Wildlife Service ("FWS") and the U.S. Department of Justice investigated and prosecuted twenty-three U.S.-based poachers and middlemen for unlawfully selling illegally caught American eel elvers in interstate commerce. U.S District Courts from South Carolina to Maine

convicted each of them on felony Lacey Act wildlife trafficking charges. *See*, *e.g.*, *United States v. Austin*, 2:17-cr-19 (E.D. Va. Feb. 14, 2017).[4]

Those investigations revealed that the ultimate buyer of illegal elvers from at least ten of those defendants was the corporate Defendant in this case, Totowa, New Jersey-based AED, and its principals. The evidence from those investigations demonstrated that Defendants AED and Huang, AED's president, purchased illegal elvers, so long as the sellers could fraudulently "cover" the transaction with a particular person's state license, even where AED and Huang and the seller knew the elvers did not come from that state. These elvers were then shipped from AED's Totowa premises by air cargo to AED's affiliated facilities in China.[5]

---

[4] *See also United States v. Sheldon*, 2:17-cr-32 (D. Me. Mar. 1, 2017); *United States v. Lewis*, 2:17-cr-41 (D. Me. Mar. 29, 2017); *United States v. Choi*, 2:16-cr-126 (D. Me. Oct. 6, 2016); *United States v. Squillace*, 2:17-cr-63 (D. Me. June 16, 2017); *United States v. Bowdoin*, 2:17-cr-62 (D. Me. June 16, 2017); *United States v. Pinkham*, 2:16-cr-128 (D. Me. Oct. 5, 2016); *United States v. Im*, 2:16-cr-127 (D. Me. Oct. 4, 2016); *United States v. Zhou*, 2:17-cr-9 (E.D. Va. Jan. 24, 2017); *United States v. Wertan*, 2:16-cr-556 (D.S.C. July 18, 2017); *United States v. Good*, 2:17-cr-121 (D. Me. Oct. 5, 2017); *United States v. Green*, 2:16-cr-124 (D. Me. Oct. 6, 2016); *United States v. Reno*, 2:16-cr-123 (D. Me. Oct. 6, 2016); *United States v. Cray*, 2:17-cr-159 (D. Me. Dec. 13, 2017); *United States v. Chan*, 3:21-cr-111 (D. Conn. July 1, 2021); United *States v. Anestis*, 2:16-cr-125 (D. Me. Oct. 6, 2016); *United States v. Bryant*, 2:16-cr-129 (D. Me. Oct. 5, 2016); *United States v. Weihe*, 2:16-cr-555 (D.S.C. July 18, 2016); *United States v. Kim*, 2:18-cr-333 (D.N.J. June 1, 2018); *United States v. Willey*, 2:17-cr-81 (D. Me. June 16, 2017); *United States v. James*, 2:16-cr-554 (D.S.C. July 18, 2016); *United States v. Kelley*, 1:18-cr-22 (D.N.J. Jan. 18, 2018); *United States v. Lewis*, 1:18-cr-22 (D.N.J. Jan. 18, 2018).

[5] It is illegal in New Jersey even to possess elvers. *See* N.J. Admin. Code § 7:25-18.2.

6

Agents later discovered that AED was trafficking not only in domestically caught American eel, but also in European eel. As alleged in the Indictment in this case, AED and the other Defendants: (1) sourced and purchased large quantities of European eel elvers, including by traveling to Europe for that purpose; (2) arranged for them to be smuggled out of European countries in violation of European Union laws; (3) received them at its affiliated company in China, which was overseen by Defendant Huang (the president of both Defendant AED and that company); (4) raised and slaughtered them; and (5) import-smuggled them as meat into Elizabeth, New Jersey, for retail sale in the United States, purposely mislabeled as American eel or not declared at all.[6] Far from being a mere "technical" compliance problem, as postured by Defendants, *see* Defs.' Mot. at 2, Defendants in fact intentionally engaged in smuggling significant quantities of illegal wildlife.

U.S. Customs and Border Protection ("CBP") records reflect that AED is the largest importer of eel meat in the United States. During the time frame of the conspiracy, AED imported well over one hundred semi-truck sized shipping containers full of eel meat from its factory in China. Each container held about 22 *tons* of prepared eel meat with an approximate retail value of $1.2 million. AED was a major, intentional player in one of, if not the largest, wildlife trafficking problems in the world.

---

[6] AED's subsidiary in Canada, formerly known as AED Canada, and its principals, are being prosecuted in Canada for the same type of smuggling. *See Her Majesty the Queen v. Qiyi Gan, Zhou Hong Xia, Yu Ping Zhuo, and Nationalwide Star Canada Corp.*, Jul. 21, 2021 (Can. Ont. Sup. Ct. J.).

The Indictment in this case focuses on six particular shipments intercepted and seized by FWS in June and July of 2017. These shipments contained between 79 – 100% European eels (with the rest being American eels). The Defendants did not have CITES export or re-export permits, as required by U.S. law, for any of these shipments. In addition, for the June 1, 6, and 13, 2017 imports, the Defendants falsely declared that the shipments contained only American eel.[7]

## II.    Legal Background

### A.    U.S. Laws Implementing the CITES Treaty

As noted above, CITES ensures that trade is regulated and sustainable through standardized import and export permits. More specifically, to engage in trade of an animal listed in Appendix II of CITES, whether live or dead, the importer must present a valid export permit issued by the country of origin. *See* CITES, Art. III. Range countries will only issue such permits upon finding that "such export will not be detrimental to the survival of that species," and "that the specimen was not obtained in contravention of the laws of that State for the protection of [wildlife]." CITES, Art. IV(2). European eels are listed in CITES Appendix II. *Id.*, Appx. II. The United States and other member countries have agreed that they "shall not allow trade . . . except in accordance with the provisions of the present Convention"). *Id.*, Art. II(4); *see also id.*, Art. VIII(1)

---

[7] Although manifested as U.S. imports, Defendants did not file any Customs entries at all for the last three shipments.

(committing that "[t]he Parties shall take appropriate measures to enforce the provisions of the present Convention").

In the United States, CITES is implemented through the ESA, which prohibits "trade in any specimens contrary to the provisions of [CITES]." 16 U.S.C. § 1538(c)(1). U.S. law requires that importers of CITES Appendix II species like European eel obtain a valid CITES export permit from the country of origin. 50 C.F.R. § 23.20. Original CITES export permits, or certified true copies, must accompany each shipment. *Id.* § 23.23. Finally, under U.S. law, all importers of wildlife must also submit an import declaration identifying the imported wildlife. *Id.* § 14.61.

## B.      Standard for Motion to Dismiss

In resolving a motion to dismiss, the district court must accept all the allegations in the indictment as true. *See United States v. Huet*, 665 F.3d 588, 595–96 (3d Cir. 2012). An indictment is facially sufficient so long as it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to [raise a double jeopardy argument]." *United States v. Vitello*, 490 F.3d 314, 320 (3d Cir. 2007) (quotation omitted). A motion to dismiss is thus "not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (citations omitted). Rather, "[t]he government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Fed. R. Crim. P., Rule 29." *Id.* at 661. A pretrial motion to dismiss

a criminal case is thus properly presented "if it involves questions of law rather than fact." *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) (citations omitted).

Courts recognize a limited exception to this rule where preliminary findings of fact are necessary to decide the questions of law presented by pretrial motions, but only so long as the court's findings on the motion do not invade the province of the ultimate finder of fact. *See United States v. Gallagher*, 602 F.2d 1139, 1142 (3d Cir. 1979). If the factual issues raised by the motion are not "capable of determination without the trial of the general issue," the court should deny the motion. *Id.* (internal quotation and citation omitted). Put another way, a defense is "capable of determination" at this stage only "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington*, 395 U.S. 57, 60 (1969).

A defendant raising an "outrageous government conduct" defense bears the burden of demonstrating that the investigation was "so outrageous as to be shocking to the universal sense of justice." *United States v. Lakhani*, 480 F.3d 171, 177 (3d Cir. 2007) (citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973); internal quotation marks omitted). The "banner of outrageous misconduct is often raised but seldom saluted." *United States v. Santana,* 6 F.3d 1, 4 (1st Cir. 1993). "Courts have rejected its application with almost monotonous regularity." *Id.* The "viability of the doctrine is hanging by a thread." *United States v. Nolan-Cooper*, 155 F.3d 221, 230 (3d Cir. 1998). The

10

"challenged conduct must be shocking, outrageous, and clearly intolerable . . .
The cases make it clear that this is an extraordinary defense reserved for only
the most egregious circumstances." *Id.* at 230-231.

Defendants are only entitled to an evidentiary hearing on a motion to
dismiss where they raise a "colorable claim." *United States v. Voigt*, 89 F.3d
1050, 1067 (3d Cir. 1996).

## III.   Procedural Posture

On March 1, 2022, a grand jury sitting in Newark returned a nine-count
Indictment against the Defendants, charging them with conspiracy to smuggle
European eel meat into the United States and to falsely label those shipments
in violation of the Lacey Act, 16 U.S.C. §§ 3372(d), 3373(d)(3)(A)(i); and related
substantive smuggling and Lacey Act false labeling counts involving the six
shipments described in section I(C) above. The Court entered an order on
December 12, 2022, establishing deadlines for pretrial motions filed pursuant
to Fed. R. Crim. P. 12(b) and 41(h). *See* ECF No. 79. The Court continued those
deadlines twice at the parties' request. *See* ECF Nos. 82, 84. Defendants AED
and Huang have now moved to dismiss the Indictment. The other defendants
who have appeared so far did not file any motion or joinder.

## IV.   Defendants Cannot Meet Their Heavy Burden to Support Their Assertion of the "Outrageous Government Conduct" Defense.

Defendants' motion argues that the investigation violated their due
process rights under the U.S. Constitution because the investigation was "so
outrageous as to be shocking to the universal sense of justice." Defs.' Mot. at

11

22 (quoting *Lakhani*, 480 F.3d at 177-78 (internal quotation marks omitted)). Despite Defendants' protestations to the contrary, there was nothing extraordinary or egregious in the conduct of the investigation. Defendants' portrayal of the investigation misconstrues and omits important events. The government will first provide a fuller recitation of what happened during the investigation and will then explain why each of the four arguments in Defendants' motion is legally baseless. As shown below, Defendants were simply caught smuggling.

### A.   The Investigation Was Routine and Not At All Shocking to the Conscience.

#### 1.   2014 Search Warrant

As explained in section I(C) above, Defendants came to the attention of authorities when evidence in other investigations revealed that they were the buyers of large quantities of illegally caught American eel elvers. Agents executed a search warrant issued by this Court on Defendant AED's business premises on April 30, 2014. At this warrant, agents seized about 30,000 illegally possessed elvers, 58 boxes of business records, and 16 electronic devices, including Defendant Huang's cellular phone. Defendant Huang retained counsel, who continue to represent him in this matter.

#### 2.   2015 Border Inspection

In service of its American eel trafficking investigation, FWS conducted a border inspection of a shipping container imported by Defendants on October

14, 2015. *See* Attachment A (Report of Investigation #006) at 2-3.[8] The

container, which arrived in the seaport of Elizabeth, New Jersey, was full of

packaged eel meat filets sent by Defendants' affiliated factory ("Company 1" in

the Indictment) in China.[9] *Id.* at 3. After the shipment was made available for

inspection at the CBP Centralized Examination Station inspection warehouse,

FWS removed three of the filets for sampling, sent the samples to a laboratory

for genetic species testing, and then cleared the container to be released from

the inspection warehouse. *Id.* It is routine – and not at all nefarious – for

inspectors or agents to release an imported shipment pending testing of

samples and further investigation. In February of 2016, the laboratory finalized

its report, finding that one of the three filets was European eel, mixed in with

American eels. *Id.* at 4, 7-8.

Defendants did not declare this wildlife import before arrival as required

by law. *See* 50 C.F.R. § 14.61. Nor did Defendants submit a valid CITES export

permit for the European eel in the shipment, as required to legally import the

species. *See* 50 C.F.R. §§ 23.20, 23.23. In fact, such a permit could not be had,

---

[8] The government has attached excerpts of three Reports of Investigation to this memorandum. The government disclosed the full reports to all Defendants last summer. Defendants cite these materials also. The attachment page numbers cited here refer to the pagination in the footer at the bottom left.

[9] This container and each other shipping container at issue in this case held individually vacuum-sealed filets of eel meat, packaged for resale, representing about 65,000 eels. *See* Attachment B (Report of Investigation #011) at 3. The market value of the goods in each container was about $1.2 million, based on retail pricing.

as explained earlier. *See* section I(B). The October 2015 shipment was FWS's first realization that Defendants may also be trafficking in European eels.

### 3. 2016 Border Inspection

In 2015 and 2016, FWS continued to translate and analyze the voluminous material seized during the 2014 search warrant, much of which was in Fujianese and Mandarin. This process was prolonged by the fact that Defendant Huang declined, through counsel, the government's request to provide the password to his phone, which this Court had authorized the government to search.[10] *Compare* Defs.' Mot. at 2-3 (lamenting the duration of the investigation); *id.* at 21 (mischaracterizing their relationship with the government as "working hand in glove" the whole time). During this time, agents also investigated and proffered defendants in related investigations, conducted inquiries into Defendants' financial records and international corporate structure, and assisted the government of Canada with a similar investigation into AED's Canadian subsidiary.

To advance the investigation, and to determine whether Defendants' October 14, 2015, importation of European eel was a fluke or part of a pattern, FWS conducted a second border inspection of another container imported by Defendants into the port of Elizabeth, on October 25, 2016. Att. B at 2. This container was offloaded from the ship and became available for inspection at the CBP inspection warehouse on November 2, 2016. *Id.* Like the October 14,

---

[10] As the operating system for Defendant Huang's phone became obsolete, technological developments eventually permitted agents to search the contents of that phone as authorized by the warrant over 18 months later, in late 2015.

2015, container, this container was not accompanied by any import paperwork, wildlife declaration, or CITES permit. *Id.* FWS placed a "hold" on the container pending inspection. This container was likewise full of 2,100 boxes containing about 65,000 total filets of eel meat:





*Id.* at 2-3. A FWS port inspector and a FWS agent removed fourteen eel meat filets for genetic testing before clearing the container to be released from the CBP examination warehouse. *Id.* at 4.

Before FWS released the container, Defendants' broker contacted FWS on November 10, 2016, to inquire why the shipment had been held and when it would be released from the CBP warehouse. *Id.* at 4-5. The FWS port inspector

15

asked the broker for import documentation. *Id.* at 9. The broker e-mailed some documents but those did not reflect the species of the eel meat. *Id.* The port inspector followed up to request the species information on November 14, 2016. *Id.* at 9, 19. Two employees of the broker then contacted the port inspection office (one by telephone and another in person) on November 14, 2016, to again request the release of the shipment. *Id.* at 5, 9-10. Later that day, the broker e-mailed documents from Defendants' factory in China, claiming the eel meat was solely American eel. *Id.* at 10, 20-23.

On November 15, 2016, the port inspector then e-mailed both the broker and Defendant Huang for confirmation of the species. *Id.* at 14, 25. Defendant Huang represented again in reply that the shipment contained exclusively American eel. *Id.* at 26-27. The next day, the inspector notified Huang and the broker that "we have let the warehouse know that the shipment is good to go," *i.e.*, that FWS was releasing the shipment from its hold at the CBP warehouse, as Defendants and their broker had been pressing FWS to do. *Id.* at 14-15, 28. On November 18, 2016, the laboratory submitted a final report showing that eleven of the fourteen samples, or 79%, were European eel; the rest were American eel. *Id.* at 29-31.

### 4.    2017 Container Seizures and Search Warrant

Between the discovery of European eels in both sampled containers, the fruits of the investigation so far, and incriminating material obtained from a March 2017 search warrant on one of Defendant Huang's email accounts, the evidence implicated Defendants in a conspiracy to intentionally smuggle large

16

quantities of European eel into the United States. FWS made arrangements to detain, sample again, and store if seized (upon laboratory results showing illegal eels), future imports by the Defendants.

FWS was notified on April 25, April 28, and May 8, 2017, of the impending arrival of three more shipping containers of eel meat destined for import by Defendants at Elizabeth, New Jersey. Attachment C (Report of Investigation #015) at 2. These containers (Containers #1 - #3 in the parties' shared parlance) arrived on June 1, 6, and 13, 2017, and were detained pending sampling and testing. *Id.* at 3, 7, 11. These three containers are the subject of Counts Two through Four and Seven through Nine. As with prior containers, these likewise originated from Defendants' factory in China. A statistics expert hired by the government developed a robust, randomized sampling protocol from which a statistically valid extrapolation of the total content of the containers could be made. *Id.* at 2. The agents followed this protocol and sent the samples – 90 from each container – to the laboratory. *Id.* at 5, 9, 13.

This Court also authorized a second search warrant of AED's business premises, focused on European eel trafficking this time. Agents executed the warrant on June 27, 2017, and seized additional boxes and electronic devices. During their encounters with Defendants and other AED employees, agents disclosed that the company and its principals were being investigated for European eel trafficking. *See* Attachment D (Report of Investigation #018) at 2.

17

While agents executed the search warrant, Defendants had three more containers (Containers #4 - #6) on cargo ships on the open sea, heading to Elizabeth for import. These three containers are the subject of Counts Five and Six. Ocean cargo liner transit from China to New Jersey takes about six weeks. CBP placed inspection holds on Containers #4 and #5 on June 29, 2017, at 10:47am and 10:48am, and on Container #6 on July 4, 2017. *Id.* at 3. By law, once an inspection hold is placed, the container *must* be presented for inspection – it cannot be removed from the ship or taken to a different port. 19 U.S.C. § 1499(a)(1). When CBP places inspection holds, the steamship line, the freight forwarder, and the broker are notified instantly by electronic means.

In the early evening on June 29, 2017, AED's counsel notified then-government counsel that he would direct AED to refuse the shipments upon arrival and to try to have the shipper return them to China. Att. D at 3-4. Government counsel then forwarded this email to the case agent and instructed her "to make sure the containers are properly flagged and held." *Id.* at 4. Containers #4 and #5 arrived at the Port of Elizabeth on July 5, 2017, and were made available for inspection (and inspected) on July 18 and 20, 2017. Att. C at 17, 22. As with Containers #1 - #3, inspectors and agents pulled 90-95 samples each from Containers #4 and #5 as directed by the statistician-created sampling plan. *See id.* at 17, 22, 25.

On June 30, 2017, while Container #6 was still on the water, Defendants contacted the freight forwarder by email to attempt to change the designation of that shipment from "Import" to "Freight Remaining on Board." Att. D at 15.

18

This designation ordinarily means that the cargo would not be unloaded from the ship, but it does not in fact trump an existing inspection hold. On July 7, 2017, a colleague of Defendants' counsel contacted CBP by email to ask if they would "remove the hold," which CBP declined. *Id.* at 6-7. A week later, on July 14, 2017, an unknown entity tried to delete or change the bill of lading from how it had originally been entered in the CBP online system prior to the ship sailing (although this would not actually negate the inspection hold). *Id.* at 10. Container #6 made land on July 25, 2017, still subject to an inspection hold, and was offloaded at the terminal. *Id.*

On July 27, 2017, prior to inspection, and without CBP clearance or authorization, an unknown person re-stowed Container #6 onto the ship on which it arrived, *id.*, in violation of Customs law. 19 U.S.C. § 1499(a)(1); *see also* 19 C.F.R. § 4.38. The ship then left the port. Att. D at 10. CBP placed a second hold on Container #6. *Id.* The ship traveled from there to Wilmington, Delaware, and left on August 1, 2017, without presenting Container #6 for inspection as required. *Id.* at 10-11. CBP then issued a formal, written re-delivery order to the steamship demanding that the container be returned to Elizabeth for inspection. *Id.* at 11. The vessel then arrived in Savannah, Georgia, on August 2, 2017, and sailed for South Korea the next day, again without having removed Container #6 for inspection as CBP had ordered. *Id.*

While the steamship was on its way to South Korea, CBP yet again demanded that the freight line return Container #6 to New Jersey for inspection. *Id.* The steamship requested that CBP cancel the re-delivery order,

complaining that it would be expensive for their customer, Defendant AED. *Id.*
CBP declined. *Id.* Almost two months later, the freight line presented Container
#6 at Elizabeth, where FWS was finally able to inspect it and take product
samples. *Id.* CBP cited the freight line and issued a $294,000 penalty. *Id.*

The laboratory tested the samples taken from all six containers. The
results were:

| Import Date | Container | Samples Taken | % European eel (entire shipment, statistical extrapolation) |
|---|---|---|---|
| 6/1/2017 | YMLU5350828 | 90 | 88 |
| 6/6/2017 | SZLU9862858 | 90 | 100 |
| 6/13/2017 | YMLU5333970 | 90 | 81 |
| 7/5/2017 | YMLY5335736 | 95 | 88 |
| 7/5/2017 | YMLU5349581 | 90 | 88 |
| 7/25/2017 | YMLU5384210 | 90 | 79 |

Att. C at 5, 10, 13, 18, 23, 26.

In summary, this was a typical investigation of goods suspected to be
smuggled, for which the evidence accumulated during the investigation showed
that it was, in fact, smuggled. The record shows that it was a fairly
conservative, reactive investigation: there was no undercover activity, no
controlled buys, no stings, no ruses, no informants, and nothing bordering on
entrapment. The agents did not violate any laws. There was nothing
extraordinary, shocking, or unfair about what they did.

### B.   The Government Is Not Obligated to Inform Suspected Smugglers When It Investigates Their Smuggling.

Defendants lodge four unfounded claims of government outrageousness.
None has any merit. First, Defendants argue that FWS and the Justice

Department violated Defendants' due process rights by not "notify[ing]" them when the government detected illicit goods in their imports. Defs.' Mot. at 21; *see also id.* at 2 (arguing that the government "single-mindedly refused to alert attorney Klestadt that there was any problem"). Defendants chafe at the fact that the government sought to "preserve the integrity of the investigation" while the investigation was ongoing, as if that were somehow improper. *Id.* at 16, 36-37; *see also id.* at 21 (covert investigations are a "misguided stealth campaign").

Defendants do not even try to ground this absurd argument in any legal authority, nor could they. It is basic common sense, and a fundamental precept of any government's investigative authority, that investigations may be made covertly. The government is not whatsoever obligated to provide "instant notice," Defs.' Mot. at 32, or *any* notice, of its investigative discoveries as they happen, contrary to Defendants' protestations. There is absolutely no obligation for the government to alert a criminal target that it has detected, and is continuing to investigate, crimes. Defendants clearly wish it were otherwise, but the sheer repetition of this fallacy does not make it true.

The fact that Defendants had a lawyer during much of the investigation does not change this. *See* Defs.' Mot. at 9 (protesting that "[n]o one also called Klestadt to tell him there was a Lacey Act problem as he had previously requested"); *id.* at 6-7, 13 (same). The parties engaged in limited ministerial communications following the 2014 search warrant. That is not the same as "work[ing] hand in glove with [the] government [ ] to ensure compliance with the law," *id.* at 21; *see also id.* at 2-3, and neither that nor anything else

21

entitles defense counsel to play-by-play updates of further investigative activity. And once it became clear that the Defendants were engaging in different, and more voluminous, criminal activity than that which was originally being investigated, while also engaging government counsel through their own counsel, then-government counsel reasonably terminated communications. As a matter of basic logic and common sense, criminal investigations of any type would be gravely impaired by forced disclosure to a target or their lawyers. The fact that an investigation was covert does not make it outrageous.

### C.     The Government Had No Obligation to Inspect or Seize Every Incoming Container.

Defendants' second and related claim is that it amounts to misconduct for FWS not to have inspected and sampled more of their imported containers. *See id.* at 27-36. As Defendants note, the government only inspected a fraction of the shipping containers Defendants imported between the first detection of European eels, and the seizure of Containers #1 - #6. *See id.* at, *e.g.*, 16-17. Defendants portray this as an active "refus[al]" to DNA-test Defendants' shipments for them. *Id.* at 3. In Defendants' view, they had a Constitutional due process right to be notified in real time of the contents of shipping containers – sent to them by their own factory – so that they could stop their criminal activity and avoid further liability. *See id.* at 26 (accusing the government of "letting crimes continue").

But again, Defendants point to no requirement that the government do so. It is a foundational principle of criminal jurisprudence that the burden of compliance with the law falls on Defendants. Defendants do not have a due

process right to have the government prevent them from committing crimes. And this is not a situation in which Defendants were unwitting buyers of an illegal product. As alleged in the Indictment – which must be taken as true at this stage – these shipments came from Defendants' own factory, which Defendants supplied with illegal wildlife in the first place.

Defendants also lambast FWS for not seizing or taking "further enforcement action" on the October 15, 2015 shipment. *Id.* at 9. But there was no requirement that FWS reveal its investigation. As explained above, the investigation was ongoing, and FWS was looking at other evidence to determine whether the European eel filets were a fluke or intentional, and how widespread the inclusion of European eel filets within the containers was. *See* section IV(A) above. Examining evidence of intent and pervasiveness of potential criminal conduct before seizing containers was due diligence, not something "indefensible." Defs.' Mot. at 37.[11]

In fact, Defendants go so far as to make the claim that it was the government – not them – who committed crimes, by: (1) deciding "not to recall the non-CITES compliant merchandise from the shipment," *id.* at 9, 29; and (2) releasing two containers to the importer while samples were being analyzed. *See id.* at 27-34. Defendants are wrong on both counts.

---

[11] Defendants also complain that FWS improperly "fail[ed]" to inspect or seize more containers just to drive up the overall dollar value of the case. *See* Defs.' Mot. at 32-36. The government firmly disputes that. But in any event, the scope of relevant conduct under U.S.S.G. §§1B1.3 and 1B1.4 is for the Court to determine at sentencing.

First, it is not mandatory for the government to issue a product recall for goods released into commerce when subsequent evidence reveals that product to have been unlawfully imported. The regulation cited by Defendants – 19 C.F.R. § 141.113, *see* Defs.' Mot. at 30, is not pertinent. It applies to goods that have been conditionally released (physically) to an importer by CBP, but not yet been formally "admitted" into the United States (*i.e.*, cleared) by CBP. 19 C.F.R. § 141.113(d). That does not apply to any of the shipments here. Nor do Defendants point to any law or regulation criminalizing the absence of such a recall, and there are none.

Second, FWS does not commit its own CITES, ESA, or Lacey Act violation by releasing goods to an importer that evidence confirms later were proven deliberately smuggled. *See* Defs.' Mot. at 30. At no time did FWS import, export, transport, acquire, possess, sell, buy, or trade the containers. *See* 16 U.S.C. §§ 1538(c), 3372(a); 50 C.F.R. § 23.13. Likewise, FWS did not engage in smuggling, *see* Defs.' Mot. at 30 (quoting 18 U.S.C. § 545), because it did not facilitate any transportation or sale. It simply removed the inspection hold.

Relatedly, Defendants argue that the Court should admonish FWS as it did the postal inspectors in *Chin*, for "causing" harm to a third party – here, the environment. *See* Defs.' Mot. at 25-26 (citing *United States v. Chin*, 934 F.2d 393 (2d Cir. 1991)). That attempted analogy is misplaced. In *Chin*, postal inspectors posing as pornography dealers encouraged the defendant to travel to Europe to buy actual child pornography on their behalf, and bring it back to the United States, where they would reimburse him for it. 934 F.2d at 395-96.

24

The court cautioned that this investigative plan was not sufficiently sensitive to the harm to "real victims" – namely, children depicted in the material the defendant actually purchased on agents' behalf, and others whose exploitation would be furthered by the defendant's participation in that illicit market. *Id.* at 399-400. But the court declined to dismiss on that basis, finding that the government's conduct, while insensitive, was not outrageous, and that the harm to child victims was caused not by the government but by Chin, who was predisposed to commit the crime. *Id.* at 400.

There is no doubt that the activities charged in this Indictment caused serious ecological harm. But it was the Defendants' preexisting eel smuggling operation, and not the government's investigation, that caused the harm. Defendants miss the important point that "in order for the claim of outrageous government conduct to succeed, a government agent has to *initiate* the criminal conduct" and "draw the defendant into the illegal activity to bring about that goal." *United States v. Pitt*, 193 F.3d 751, 761 (3d Cir. 1999) (emphasis added). Neither of those things happened here. The conspiracy had been going on for years by the time FWS did the first container inspection.

Indeed, this Circuit has seen "only [one] case in which the Government's conduct has offended due process," *Lakhani*, 480 F.3d at 182, resulting in dismissal – *United States v. Twigg*, 588 F.3d 373, 378 (3d Cir. 1978). *Twigg*, relied upon by Defendants, stands in stark contrast to the case here. In *Twigg*, the government directed its undercover cooperator to: (1) propose to the two defendants that they all set up a methamphetamine lab; (2) "undert[ake] the

25

acquisition of the necessary equipment" to produce meth; and (3) direct the defendants' "production assistance" in the meth lab, which was "minor." *Twigg*, 588 F.3d at 375-376. In other words, the government was "completely in charge of the entire laboratory." *Id.* at 375. In light of all that, the Court reasoned, "the nature and extent of police involvement in this crime was so overreaching as to bar prosecution" on due process grounds. *Id.* at 376.

The continuing validity of the narrow outrageous conduct defense annunciated in *Twigg* has been called into doubt by several Third Circuit cases. *See Pitt*, 193 F.3d at 761 n.11 (collecting cases). But even assuming *Twigg* is still good law, superimposing its facts upon this case illustrates just how far beyond the bounds of common sense Defendants' arguments lie. For the result in *Twigg* to apply here, the government would have had to: (1) cultivate a suitable undercover operative; (2) propose to Defendant Huang and the others that they all get together and commence operating an eel trafficking syndicate; (3) purchase and acquire the equipment to poach, raise, slaughter, and package eels; (4) retain complete operational control of Defendants' New Jersey facility and their factory in China; and (5) relegate Defendants' actual production assistance to a minor role. *See id.* Since none of that is close to being true here – and Defendants do not even argue that it is – the motion must fail.

Defendants' other cited cases are equally poor points of comparison. *See*, *e.g.*, *Lakhani*, 480 F.3d at 182 (FBI informant actively solicited defendant to illegally sell him surface-to-air missiles); *Chin*, 934 F.2d at 399 (postal

26

inspectors contrived fake child pornography magazine store, initiated contact with defendant, and encouraged him to travel to Europe to buy child pornography); *Pitt*, 193 F.3d at 754-55 (DEA agent approved of plan where defendant, his undercover operative, would purchase a boat to smuggle cocaine, but failed to properly supervise him in the actual movement of drugs); *United States v. Stenberg*, 803 F.2d 422, 430-31 (9th Cir. 1986) (undercover agents investigating poaching actually hunted and killed two protected elk themselves). And even in these much more aggressive scenarios, courts found no outrageous government conduct and no due process violation. Since there was no due process violation there, there is none here.

> **D.    The Government Did Not Mislead Defendants Into Thinking That It Was Okay to Continue Smuggling European Eel.**

Defendants' third argument is likewise specious. They claim that they were "lulled" into continuing to commit crimes because of a three-word phrase in one email, which they claim amounts to the government's approval of their whole course of conduct. Defs.' Mot. at 2. In particular, they point to an email dated November 16, 2016, regarding the inspection of the October 25, 2016, container. *See id.* at 3, 11-13. As described earlier, this container was detained and moved to the CBP inspection warehouse for examination. *See* section IV(A)(3) above. Between November 10 and November 16, 2016, Defendants and their broker made repeated inquiries of FWS as to why the container was being held and when it would be released from the CBP inspection warehouse. *See* Att. B at 4-5, 9-10. During that email conversation, FWS requested additional

27

required documents and information that were missing from the shipment. *Id.*
at 9, 14, 25. This exchange culminated in the email in question, in which the
inspector told Defendants' broker that "we have let the warehouse know the
shipment is good to go," *i.e.*, that the warehouse could release it to them. *Id.* at
15, 28; *see also* Defs.' Mot. at 11.

Throughout their brief, Defendants repeatedly trumpet the phrase "good
to go" as if the email were an affirmative imprimatur of government approval
over their entire conspiracy, or an "outright" "lie" by FWS and the Department
of Justice that was "designed to lull and mislead" them into committing more
crimes. *Id.* at 13-14. But Defendants conspicuously ignore the rest of the
sentence and the context in which it arises.

No reasonable person would interpret "we have let the warehouse know
the shipment is good to go" as "we tested your shipments and found that they
have illegal wildlife products, but it's okay for you to keep shipping illegal
wildlife products." But even if that three-word phrase – the sum total of the
alleged government encouragement in this case – had the meaning ascribed to
it by Defendants, it still pales in comparison to the level of government
involvement and instigation in the cases cited by Defendants. *See*, *e.g.*, *Chin*,
934 F.2d at 399 (postal inspectors contrived fake child pornography magazine
store, initiated contact with defendant, sent him a fake survey about his sexual
preferences, "befriended" him through a series of personal letters about child
exploitation, and encouraged him to travel to Europe to buy child

pornography). And even in *Chin*, the court declined to find impermissible government conduct. *See id.* at 400. The Court should do likewise here.

### E.   It Was Not "Unfair" or "Outrageous" to Inspect Containers #4 - #6 and Charge Defendants for the Contraband Within.

Finally, Defendants claim that it is "unfair," and thus presumably also outrageous, that the government inspected Containers #4 - #6, and eventually brought charges based on their illegal contents. Defs.' Mot. at 17-21, 37. This assertion fails just like the others. As explained above, while FWS detained and inspected Containers #1 - #3 and executed a search warrant at AED's business premises, Defendants had three more containers (Containers #4 - #6) still on the open sea, heading to New Jersey. *See* section IV(A). CBP placed inspection holds on Containers #4 and #5 on June 29, 2017, at 10:47am and 10:48am, and on Container #6 on July 4, 2017, using an electronic notification system. *See* Att. D at 3.

Once an inspection hold is placed, the container *must* be presented for inspection if that ship enters port in the United States (or even if it merely comes into U.S. territorial waters, *see* 19 C.F.R. § 162.3(a)(1), (3)) – it cannot be removed from the ship or taken to a different country. 19 U.S.C. § 1499(a)(1). Defendants claim that they tried to prevent Containers #4 – #6 from entry, to avoid the consummation of smuggling crimes. *See* Defs.' Mot. at 17-18, 37. But these efforts occurred *after* a Court-authorized search warrant had been executed on Defendants' business and *after* Defendants learned of the hold.

As summarized earlier in section IV(A)(3), it was not until June 30, 2017, that Defendants contacted the freight forwarder email to attempt to change the designation of that shipment from "Import" to "Freight Remaining on Board." Att. D at 15. This designation ordinarily means that the cargo would not be unloaded from the ship, but it does not in fact trump an existing inspection hold. On July 7, 2017, a colleague of Defendants' counsel contacted CBP by email to ask if they would "remove the hold," which CBP declined. *Id.* at 6-7. A week later, on July 14, 2017, an unknown entity tried to delete or change the bill of lading from how it had originally been entered in the CBP online system (as a U.S. import) prior to the ship sailing. *Id.* at 10. All three of these efforts were insufficient and too late. Further, freight line emails reveal that the point of these efforts was to "avoid the Global terminal [CBP] exam." *Id.* at 26-27.

Worse yet, on July 27, 2017, before inspection, and without CBP authorization, an unknown person *removed Container #6 from the terminal* after sitting on U.S. soil for two days, and re-stowed it onto the ship it came over on, *id.* at 10, in violation of Customs law. 19 U.S.C. § 1499(a)(1); *see also* 19 C.F.R. § 4.38(a). That ship then departed prior to inspection. As detailed in section IV(A)(3), the ship then dodged inspection again at two other U.S. ports before sailing to South Korea. Eventually Container #6 returned for inspection, months later, and CBP fined the freight line for the re-stowing violation. Att. D at 11. FWS seized all six containers, which were found to contain between 79 and 100% European eel. *See* section IV(A)(3) above.

Defendants' counsel makes much of his own communications with the then-prosecutors around the time of the hold. *See* Defs.' Mot. at 18-19, Klestadt Decl. ¶¶ 33-35.[12] The government disputes that defense counsel contacted anyone in the government about the cargo's designation, before the institution of the hold. But either way, that has no legal relevance. DOJ counsel had no authority to remove the hold, and in any event, defense counsel did not ask them to. *See* Klestadt Decl. at 25. The only way to have legitimately prevented the inspections would have been to prevail upon the steamship to return to China or another port before entering U.S. waters. *See* 19 C.F.R. § 162.3(a)(1), (3). This could have occurred either before or after CBP placed the inspection hold. But Defendants did not do or seemingly attempt this.

Defendants also claim that "10 CFR 18.25(a)(i)" [*sic*] automatically afforded them the opportunity to make "immediate exportation" upon the ships' landing. Defs.' Mot. at 21. But that regulation does not override or circumvent an inspection hold. And to avail themselves of the immediate export provisions in 19 C.F.R. § 18.25, Defendants would have had to either file an entry, or made an "application" to CBP for "in-bond" status, which CBP would have had to approve. *See* 19 C.F.R. § 18.25(a)(1). Defendants did neither. Nor would CBP

---

[12] Defendants insinuate that the government has violated *Brady* by not producing the voice mail their counsel alleges he left on June 28, 2017 requesting the agent to ask the then-prosecutors to call him. Defs.' Mot. at 19 & n.8. The agent does not recall receiving that voice mail; there is nothing to produce. Nor does the government have any records or notes regarding any phone calls received by defense counsel on that date.

have granted permission for that, given the enforcement purpose of the inspection hold. That regulation is unavailing.

As for the charges themselves, there was no "arrangement" between Defendants' counsel and the former prosecutors, and Defendants point to none. Defs.' Mot. at 19, 37. Nor have Defendants provided any support for their assertion that DOJ "worked cooperatively with Klestadt to find a solution . . . to avoid a smuggling violation." *Id.* To the contrary, the prior prosecutors directed the agents to ensure that the holds had *not* been removed. *See* Att. D at 4. Defendants' cited emails regarding a "constructive seizure agreement" pertained only to storage costs for the containers after they were seized, Klestadt Decl. at 27, and not to anything substantive.

Defendants' argument boils down to: it was unfair for the government not to lift the inspection hold, given that Defendants tried to walk away from the shipments before they actually arrived. But it was imminently reasonable – and not outrageous – for CBP and FWS to decline to exercise their inspection discretion in Defendants' preferred fashion. That is particularly true given the unlawful re-stowing of Container #6. In its totality, all the evidence points to Defendants simply wanting to avoid detection of the crime they had already commenced. It was proper, and not outrageous, for the government to inspect Containers #4 - #6 and to bring charges based on their illegal contents.

## V.    Defendants' Motion Also Raises Issues of Fact Going Directly to the Charges.

### A.    The Court Can and Should Deny the Motion Without Wading Into Defendants' Intent Arguments.

As shown in the previous section, the Court can and should reject Defendants' outrageous government conduct claim because there was nothing outrageous about the investigation. Defendants' motion makes additional arguments about *Defendants'* intent and state of mind in committing the crimes, which go to the ultimate merits of the case. These are not relevant to the defense raised in the motion, which goes to the Government's conduct during the investigation, not the Defendants.' *See Lakhani*, 480 F.3d at 177 ("the defense of due process focuses exclusively on the conduct of the Government").

In particular, Defendants assert that:

- they had no idea the shipments contained European eel, *see* Defs.' Mot at 6, 7 & n.5, 27, 30, 35; Klestadt Decl. ¶¶ 7, 22;

- they would have presented CITES permits if they had known about the European eels in the containers, *see* Defs.' Mot. at 7 n.5, 35;

- they purchased adult eels from purportedly independent growing facilities after the eels had been raised, *see* Defs.' Mot. at 5, 30; Klestadt Decl. ¶ 8;

- they had an arrangement with these facilities to purchase American rather than European eels (despite Defendants' supplying European eel elvers in the first place), *see* Defs.' Mot. at 5, 30, 35; Klestadt Decl. ¶ 8;

- they could have used permits/quota from the Chinese government, *see* Defs.' Mot. at 35-36 & n.17; Klestadt Decl. ¶ 8 n.4, 31;

- American eels and European eels can cohabitate and cannot be visually distinguished, *see* Defs.' Mot. at 5 n.4; Klestadt Decl. ¶ 8 n.4; and

- their factory in China engaged in occasional DNA testing of species. *See* Defs.' Mot. at 6.

Resolving these issues "would be of no assistance in determining the validity of the defense," *Covington*, 395 U.S. at 60, because they are irrelevant to the purported outrageousness of how the investigation was conducted. Rather, they go to the *Defendants'* state of mind, not the government's actions. Accordingly, Defendants' motion is "capable of determination" – and denial – at this stage without considering those merits issues. *Id.* And since "the issue of outrageous government conduct is for the court, and not the jury, to resolve," *Pitt*, 193 F.3d at 760, the Court should rule on it at this time and deny the motion on its merits.

### B.   In the Alternative, If the Court Cannot Resolve the Asserted Defense Without Addressing Defendants' Intent Issues, It Should Deny the Motion on That Basis.

The Government vigorously disputes each of the defense arguments in the bullet points above in section V(A). We will present ample evidence at trial to dispel them, including shipping documents, wire transfers, and dozens of emails and text messages in the Defendants' own words that reveal their criminal intent. That just goes to show that those factual assertions should be left for the jury to decide based on the evidence at trial. *See Gallagher*, 602 F.2d at 1142. If the Court finds that it must rely on any of them to rule on the asserted outrageous conduct defense, it should deny the motion on that procedural basis. *See Covington*, 395 U.S. at 60.

34

**VI.    The Court Should Decline Defendants' Request for an Evidentiary Hearing.**

Finally, Defendants seek an evidentiary hearing. *See* Defs.' Mot. at 32. They are not entitled to one. On a motion to dismiss for a due process violation, such a hearing is required only if a defendant raises a "colorable claim." *Voigt*, 89 F.3d at 1067. As explained above, none of Defendants' arguments is colorable. There are also no genuine issues of disputed material fact. Accordingly, the Court should deny Defendants' request for a hearing. *See*, *e.g.*, *United States v. Dunham*, 2021 WL 3045372, *4 (E.D. Pa. July 20, 2021) (cited in Defs.' Mot. at 22; affirming district court's denial of evidentiary hearing on motion to dismiss).

**VII.    Conclusion**

Defendants fail to raise a colorable claim, let alone carry their heavy burden to support this deeply disfavored defense. As in *Pitt*, "the claim of outrageous government conduct is totally lacking in merit." 193 F.3d at 762. The Court should deny Defendants' motion without a hearing.

Respectfully submitted:

TODD S. KIM
Assistant Attorney General


    s/ Ethan Eddy
ETHAN EDDY
MATTHEW EVANS
Trial Attorneys
U.S. Department of Justice
Environmental Crimes Section
150 M St. NE
Washington, DC 20002

Cal. Bar No. 237214
(202) 305-0202
ethan.eddy@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2023, I electronically filed the within and foregoing **GOVERNMENT'S OPPOSITION TO DEFENDANT AMERICAN EEL DEPOT'S AND DEFENDANT HUANG'S MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

U.S. DEPARTMENT OF JUSTICE

s/ Ethan Eddy
Trial Attorney